<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ALFRED DEGENNARO,<br><br>Plaintiff,<br><br>v.<br><br>RALLY MANUFACTURING INC., et al.,<br><br>Defendants. | Civil Action No.: 09-443 (PGS)<br><br>**Memorandum and Order** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on defendants Rally Manufacturing, Inc. ("Rally") and Pep Boys–Manny Moe & Jack of Delaware Inc.'s ("Pep Boys") motion for partial summary judgment.

On January 30, 2009, plaintiff Alfred DeGennaro ("Plaintiff") filed a complaint against Rally and Pep Boys (collectively "Defendants") which sets forth eleven counts that can be summarized as claims of: (1) negligence against Rally, Pep Boys, and John Doe packaging company; (2) recklessness and wanton negligence against Rally, Pep Boys, and John Doe packaging company; (3) strict products liability against Rally and Pep Boys; (4) breach of contract against Pep Boys; (5) breach of express warranties against Rally and Pep Boys; (6) breach of implied warranties against Rally and Pep Boys.

Defendants seek summary judgment dismissal of Plaintiff's punitive damages claims against Rally and Pep Boys. (Defendants' Moving Br., p. 1). Pep Boys further seeks summary

1

judgment on the product liability claims in their entirety.  (Defendants' Moving Br., p. 2).  For the reasons set forth below, this Court grants in part and denies in part the Defendants' motion.

# I

The following summary of the facts is primarily drawn from the moving party's statement of undisputed facts.  The facts are supplemented with allegations in the complaint and Plaintiff's submitted evidence where the Plaintiff has contested the moving party's facts.  On or about February 15, 2007, Plaintiff purchased a Rally "Boost-It" battery pack from Pep Boys. (Defendants' Statement of Undisputed Material Facts, ¶¶ 1-2).  The product was packaged within a heat-sealed PVC wrapper.  (Complaint, ¶ 13).  Affixed to the Boost-It was a warning label stating that "[f]ailure to follow instructions may cause damage or explosion hazard." (Plaintiff's Opposition Br., Ex. F).  The unit also came with a separate instruction sheet including cautions about the potentially flammable or explosive aspects of the product's lead-acid battery.[1]  (Plaintiff's Opposition Br., Ex. G).

Soon after Plaintiff left the Pep Boys store, the Boost-It unit spontaneously exploded in his hands.  (Defendants' Statement of Undisputed Material Facts, ¶ 3; Complaint, ¶ 7).  Plaintiff suggests that combustible gases collected within the heat-sealed plastic packaging of the Boost-It and then exploded.  (Complaint, ¶ 13).  Plaintiff's expert witness Robert Hamlen, PhD., posited

---

[1] According to the Boost-It instructions sheet:
   "Working around Lead-Acid Batteries may be dangerous.  Lead-acid batteries generate explosive gases during normal charging and jump-starting operations";
   "All lead-acid batteries (car, truck, and boat) produce hydrogen gas which may violently explode in the presence of fire or sparks.  Do not smoke, use matches, lighters or open flames while near batteries";
   "Do not operate this device while wearing vinyl clothing.  Static electricity sparks maybe [sic] generated when vinyl clothing is rubbed." (Plaintiff's Opposition Br., Ex. G).

that the Boost-It's heat-sealed packaging design was defective and that this defect "should have been apparent to the designers." (Plaintiff's Opposition Br., Ex. H-2). Dr. Hamlen also asserted that car mechanics and "personnel of a company dealing with lead-acid batteries" are familiar with the danger posed by unventilated lead-acid batteries. (Plaintiff's Opposition Br., Ex. H-3). In their answer, Rally conceded that the heat-sealed packaging for Plaintiff's Boost-It was defective because it did not allow for sufficient ventilation. (Defendants' Statement of Undisputed Material Facts, ¶ 4).

Plaintiff's Boost-It was part of a two thousand unit order produced on Rally's behalf by a Chinese manufacturer. (Plaintiff's Opposition Br., p. 3, Ex. E-1 & Ex. J-13). On January 16, 2006, before units from this order were manufactured, Rally completed an engineering report on a sample unit. (Defendants' Statement of Undisputed Material Facts, ¶ 7). The January 16th report identified no defects and the production sample was approved. (Defendants' Statement of Undisputed Material Facts, ¶ 7). However, the report indicates that no packaging was tested. (Plaintiff's Opposition Br., Ex. J-13, J-15). On April 3, 2006, before units from the Chinese order were distributed, Rally completed another engineering test report. (Defendants' Statement of Undisputed Material Facts, ¶ 8). This report stated that all aspects of the sample unit passed inspection, including the packaging. (Defendants' Statement of Undisputed Material Facts, ¶ 8); *see also* Plaintiff's Opposition Br., Ex. J-16, J-18).

Prior to the explosion of Plaintiff's Boost-It, Rally knew of at least one Boost-It unit which appears to have exploded in a similar fashion. On November 29, 2006, Rally's President Wayne Yodzio received an e-mail containing pictures of a damaged Boost-It from an employee of AutoZone Mexico. (Defendants' Statement of Undisputed Material Facts, ¶ 9). On the next day, November 30th, Mr. Yodzio e-mailed a response to AutoZone Mexico stating that Rally had

3

"never experienced a significant failure on this item." (Defendants' Statement of Undisputed Material Facts, ¶ 13; Plaintiff's Opposition Br., Ex. J-11). Mr. Yodzio reported that Rally's head engineer had reviewed the pictures, prior Boost-It engineering reports, and Rally's customer complaint files. (Defendants' Statement of Undisputed Material Facts, ¶ 13). Mr. Yodzio further reported that:

> [O]ur assessment is that the unit was damaged or dropped during shipping. In addition, it does not appear from the photo that the battery exploded which was my biggest concern. From the pictures it appears that the plastic housing exploded. We would like to receive the damaged unit as soon as possible so we can have our engineering department evaluate the actual cause of the damage.
>
> Plaintiff's Opposition Br., Ex. J-11.

Rally tested the remnants of the exploded Boost-It from AutoZone Mexico and memorialized the results in a January 31, 2007 engineering report. (Defendants' Statement of Undisputed Material Facts, ¶ 17; *see also* Plaintiff's Opposition Br., Ex. J-2, J-19). The engineering report also references another damaged Boost-It; the genesis of that unit is unexplained. (Plaintiff's Opposition Br., Ex. J-19). The report describes both units' casings as "broken and/or damaged extensively." (Plaintiff's Opposition Br., Ex. J-19). The January 31st report concludes that "[b]oth products [were] damaged during shipment" and suggests replacing the units or providing a refund. (Defendants' Statement of Undisputed Material Facts, ¶ 18; *see also* Plaintiff's Opposition Br., Ex. J-19). The report does not identify a ventilation problem or any other design defects in the product.

Rally conducted further testing on the Boost-It after the Plaintiff's unit exploded in February 2007. (Defendants' Statement of Undisputed Material Facts, ¶ 20). This testing resulted in an engineering report, dated March 12, 2007, which identified a defect in the Boost-

It's heat-sealed packaging. (Defendants' Statement of Undisputed Material Facts, ¶ 20). On March 26, 2007, Rally formalized an "Engineering Change Notice" ordering that manufacturers omit the "heat-seal" on certain parts of the Boost-It's plastic packaging. (Defendants' Statement of Undisputed Material Facts, ¶ 21; *see also* Defendants' Moving Br., Ex. L).

Rally also commissioned a report on the Boost-It from an independent testing company, Intertek ETL Semko ("Intertek"). The April 23, 2007 report included analysis of both a new Boost-It and a damaged unit. (Plaintiff's Opposition Br., Ex. I). Intertek's report did not identify any packaging defect or ventilation concern and stated that:

> Review of the damaged product showed damage . . . consistent with results experienced from a drop of the product. If there were any undue internal pressures within the enclosure, the impact from the drop could cause the enclosure damage, however we were unable to re-create this situation in the new sample.

Plaintiff's Opposition Br., Ex. I-10.

Pep Boys had no role in the design, manufacture, or packaging of Boost-It, but sold 2,213 units from 2005 through February 17, 2007. (Defendants' Statement of Undisputed Material Facts, ¶ 5; Plaintiff's Opposition Br., Ex. L). For the same time period, Pep Boys has no records of any customer complaint, claim, or lawsuit concerning the Boost-It. (Plaintiff's Opposition Br., Ex. M-1).

After the February 2007 explosion of Plaintiff's Boost-It, Pep Boys's liability department received reports of two other relevant incidents involving the Boost-It. On February 22, 2007, a Pep Boys employee reported that he heard a hissing sound upon opening the packaging of two Boost-It units. (Plaintiff's Opposition Br., p. 6 & Ex. M-7). On March 9, 2007, a Pep Boys manager reported that a Boost-It exploded in his hands. (Plaintiff's Opposition Br., p. 6 & Ex. M-10). On March 12, 2007, in an e-mail chain concerning the latter incident, Timothy Hurford,

5

a General Liability Manager for Pep Boys, stated that "[w]e are having a lot [sic] of these type complaints we may want to pull these."  (Plaintiff's Opposition Br., p. 12 & Ex. M-9).  Later, Hurford responded to a co-worker's request for more details on the complaints by stating that there had been a "customer claim."  (Plaintiff's Opposition Br., Ex. M-9).

## II

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A genuine dispute as to a material fact exists only if a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, the judge must view the evidence through the "prism" of the non-moving party's substantive evidentiary burden at trial – preponderance of the evidence, clear and convincing evidence, or other. *Id.* at 254.  A fact is considered material only if it may affect the outcome of the litigation based upon the substantive law. *Id.* at 255.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor. *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

After a party files a motion for summary judgment, along with supporting papers, the non-moving party must produce specific facts showing that there is a genuine issue for trial. *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985) (citation omitted).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (citing Fed.

R. Civ. P. 56(e)).  If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate."  *Alevras v. Tacopina*, 226 F. App'x. 222, 227 (3d Cir. 2007).

# III

Consolidation of the Product Liability Claims

The New Jersey Products Liability Act ("NJPLA") provides the exclusive remedy for all "product liability actions" brought under New Jersey law.  *DeBenedetto v. Denny's, Inc.*, 23 A.3d 496, 499 (N.J. Super. Ct. Law Div. 2010); *see also New Hope Pipe Liners, LLC v. Composites One, LCC*, 2009 WL 4282644, **2-3 (D.N.J. Nov. 30, 2009).  "'Product liability action' means any claim or action brought by a claimant for harm caused by a product, irrespective of the theory underlying the claim, except actions for harm caused by breach of an express warranty."  N.J. Stat. Ann. § 2A:58C-1(b)(3).  Plaintiff has only one NJPLA cause of action against each defendant.  Counts that style this same claim in an alternative theory such as breach of contract, negligence, or breach of implied warranty must be dismissed.  Three theories of liability may move forward: NJPLA strict liability, wanton and willful recklessness, and breach of express warranty.

Accordingly, Counts One, Four, Seven, Nine and Ten[2] are dismissed.

Motion for Summary Judgment on Punitive Damages

Defendants assert that summary judgment dismissal of Plaintiff's punitive damages claim is warranted.  The New Jersey Punitive Damages Act ("NJPDA") limits the award of punitive

---

[2] Please note that Counts Nine and Ten are misnumbered in the complaint as the second Count Eight and Count Nine respectively.

damages to cases where "the *plaintiff proves, by clear and convincing evidence*, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by *actual malice* or accompanied by a *wanton and willful disregard* of persons who foreseeably might be harmed by those acts or omissions. N.J. Stat. Ann. § 2A:15-5.12(a) (emphasis added). Malice requires *intentional* wrong-doing. N.J. Stat. Ann. § 2A:15-5.10 (emphasis added). "'Wanton and willful disregard' means a deliberate act or omission *with knowledge of a high degree of probability of harm* to another and reckless indifference to the consequences of such act or omission." N.J. Stat. Ann. § 2A:15-5.10 (emphasis added). Proof of negligence, even gross negligence, is insufficient for the Court to grant punitive damages. N.J. Stat. Ann. § 2A:15-5.12(a). At a minimum, Plaintiff must show that a reasonable person with Defendants' knowledge about the Boost-It would consider sales of the product to be a serious risk. *See Smith v. Whitaker*, 734 A.2d 243, 254 (N.J. 1999).

  The relevant factual questions are whether the Defendants were aware of risks associated with Boost-It and whether the Defendants' response to those risks demonstrates wanton and willful disregard to foreseeable victims.[3] If Rally and/or Pep Boys sold the Boost-It with knowledge of its explosive packaging defect, then it would be appropriate to allow the punitive damages claim. *See Zakrocki v. Ford Motor Co.,* 2009 WL 2243986, **23 -24  (N.J. Super. Ct. App. Div. 2009) (reasonable jury could find wanton and willful disregard to others where car manufacturer knew of defect causing occasional accelerator failure). If Rally and/or Pep Boys sold the Boost-It without taking care to identify and resolve any risks posed by the Boost-It, then

---

[3] Plaintiff incorrectly asserts that the Court should charge Defendants with knowledge of the defect. (*See* Plaintiff's Opposition Br., p. 6). All cases cited in support of this proposition are strict liability decisions in which no punitive damages were sought. The NJPDA requirement that plaintiff prove malice or willful and wanton disregard applies in product liability cases. *See Perlman v. Virtua Health, Inc.*, 2005 WL 1038953, *9 (D.N.J. May 3, 2005)

the punitive damages claim should proceed. *See Brady v. Rockwell Int'l. Corp.*, 1993 WL 424238, *6 (D.N.J. Oct. 14, 1993) (reasonable jury could find wanton and willful disregard to others where airplane manufacturer's review of critical component was undermined by forgeries and unrealistic testing conditions). On the other hand, mere knowledge of a prior Boost-It failures is insufficient for a finding of willful and wanton disregard, so long as testing was conducted that demonstrated the product's safety. *See Hatala v. Morey's Pier, Inc.,* 2007 WL 2159615, **1-4 (D.N.J. July 25, 2007) (dismissing punitive damages claim arising from amusement ride injuries where nine persons had previously been injured in the same manner but where the amusement had passed safety inspections); *Pavlova v. Mint Mgmt. Corp.,* 868 A.2d 322, 324-25, 328 (N.J. Super. Ct. App. Div. 2005) (dismissing punitive damages claim arising from housing fire where radiator placement had been identified as cause of two prior fires but where radiator placement had since been approved by fire inspectors).

  According to Defendants, the record demonstrates that Rally and Pep Boys were unaware of the Boost-It's packaging defect at the time of Plaintiff's injuries despite extensive efforts to ensure the product's safety. (Defendants' Moving Br., p. 7). As to Pep Boys, the Defendants rely on the absence of any proof that Pep Boys knew of the defect or any prior Boost-It failures. (Defendants' Moving Br., p. 9, 11). Defendants also note that the retailer had no involvement in designing, testing, manufacturing, packaging, or labeling the Boost-It. (Defendants' Statement of Undisputed Material Facts, ¶ 5). Turning to Rally, Defendants rely on the manufacturer's repeated testing of the product and the conclusion of this testing that there was no packaging defect. Rally performed a pre-distribution engineering test of the Boost-It which approved all aspects of the product, including packaging. (Defendants' Statement of Undisputed Material Facts, ¶ 8). When Rally first learned of an exploded Boost-It unit, it reviewed the photographs

9

and concluded that shipping was the sole cause of the damage. (Defendants' Statement of Undisputed Material Facts, ¶ 9). Finally, Rally reviewed the remnants of the first exploded Boost-It unit and completed an engineering report which identified no defects and again identified shipping damage as the culprit. (Defendants' Statement of Undisputed Material Facts, ¶¶ 17-18).

Plaintiff does not contest any of these facts, except to make conclusory accusations that Rally's testing reports were fraudulent. (*See* Plaintiff's Statement of Disputed Material Facts, ¶¶ 8, 18). The undisputed evidence indicates that Defendants were unaware of the packaging defect before Plaintiff's February 17, 2007 incident. The evidence also demonstrates that Defendants conscientiously endeavored to identify and address any risks posed by the Boost-It to others. The evidence shows that, in reliance on the repeated Boost-It tests, Defendants believed that the Boost-It was a safe product. Defendants' moving papers demonstrate that, as a matter of law, neither company acted with malice or wanton and willful recklessness.

In response, Plaintiff argues that the following evidence raises a genuine issue of fact concerning the Defendants' knowledge of the Boost-It packaging defect and general regard for customer safety. (Plaintiff's Opposition Br., pp. 3-4, 7-8). Plaintiff points to: (1) the Boost-It unit's label disclosing an "explosion hazard" (Plaintiff's Opposition Br., Ex. F); (2) the Boost-It's instruction sheet discussing steps to avoid explosion and fire risks (Plaintiff's Opposition Br., Ex. G); (3) the general awareness among automotive technicians and engineers that lead-acid batteries must be ventilated (Plaintiff's Opposition Br., Ex. H); (4) Occupational Safety & Health Administration ("OSHA") workplace regulations requiring ventilation in workplaces with

lead-acid batteries;[4] (5) visible indications on the perimeter of the Boost-It's plastic packaging that pressure was building inside (Plaintiff's Opposition Br., Ex. K; *see also* Plaintiff's Statement of Disputed Material Facts, ¶ 5); (6) Rally's knowledge of the previous Boost-It explosion reported by AutoZone Mexico (Defendants' Statement of Undisputed Material Facts, ¶ 9); and (7) Rally's access to photographic and physical evidence from the exploded AutoZone Mexico Boost-It (Defendants' Statement of Undisputed Material Facts, ¶¶ 9, 20).

Plaintiff failed to identify any evidence demonstrating a triable issue of fact concerning Defendants' awareness of the packaging defect before Plaintiff's Boost-It exploded. The Boost-It's warning label and instructions indicate that Defendants knew the product contained a potentially dangerous lead-acid battery component. A reasonable jury could also find that the Defendants were aware that lead-acid batteries must be ventilated because this knowledge is common among those in the industry. Taken together, these facts suggest that Defendants should have known of the packaging defect. However, no reasonable jury could find that these facts prove by "clear and convincing evidence" that Defendants knew of the defect. Similarly, no triable issue is raised by the possibility that one could have ascertained the packaging defect by visually examining the perimeter of the Boost-It's plastic packaging generally or by reviewing the photographic and physical evidence from the exploded AutoZone Mexico unit. A jury could also conclude that Rally knew two Boost-It units had exploded before Plaintiff experienced his injuries.[5] Knowledge of a failure is markedly different from understanding the

---

[4] In this case, OSHA regulations merely serve as evidence that lead-acid battery risks are widely known. The regulations do not serve as a standard of care because there are no negligence claims at issue in this decision.

[5] Rally's January 2007 report analyzed two different Boost-It units with damaged casings. One unit was the exploded Boost-It identified by AutoZone Mexico. The history of the other unit is unclear. (Plaintiff's Statement of Disputed Material Facts, ¶ 12). It is assumed for the purposes

reasons for the failure, especially in a complicated mechanical product. All the evidence available indicates that Rally believed shipping damage caused the two prior Boost-It explosions, not any design defect in the product's packaging.

Plaintiff failed to present any evidence demonstrating a triable issue of fact regarding the alleged recklessness of Defendants' Boost-It sales in light of the known risks. As explained above, a reasonable jury could conclude that Defendants knew of the risks concerning lead-acid batteries, particularly the dangers posed by unventilated lead-acid batteries. The jury could also conclude that Rally was aware that two Boost-It units had exploded before Plaintiff experienced his injuries. However, Plaintiff presents no evidence showing that Defendants willfully ignored these risks. Instead, Rally tested their product repeatedly in response to these known risks. Although Plaintiff repeatedly argues that Rally's testing was deficient, he presents no evidence on the matter. The soundness of Rally's testing is buttressed by the later independent testing by Intertek which was also unable to identify the packaging defect. Rally's extensive testing concluded that the product had no defects. No reasonable person with this knowledge could consider the Defendants' sales of the Boost-It to constitute a serious risk.

Even viewing the evidence in the light most favorable to the Plaintiff, there is no indication that Rally and/or Pep Boys knew of the packaging defect or any other hazard that would put Boost-It purchasers at risk. As a matter of law, there is no way that a reasonable jury could find clear and convincing evidence that Defendants' conduct was malicious or wantonly and willfully reckless.

Accordingly, Counts Two and Five are dismissed.

---

of this motion that the second unit exploded in a similar fashion to Plaintiff's Boost-It.

Pep Boys's "Seller" Defense to All Product Liability Claims

The NJPLA provides product "sellers" with a two-part affirmative defense to "product liability actions." This limited exception from the strict liability regime of products cases is intended to reduce litigation costs borne by innocent retailers. *Claypotch v. Heller, Inc.*, 823 A.2d 844, 851-52 (N.J. Super. Ct. App. Div. 2003) (citing Sponsor's Statement to S. 1495 of 1995, enacted as L.1995, c. 141)). To benefit from this defense, the seller must first identify the product manufacturer if that company is not yet party to the case. *See* N.J. Stat. Ann. § 2A:58C-9(a-b). Even where the seller identifies a manufacturer against whom relief can be obtained, the seller is still liable if:

> (1) The product seller has exercised some significant control over the design, manufacture, packaging or labeling of the product relative to the alleged defect in the product which caused the injury, death or damage; or
> (2) The product seller *knew or should have known of the defect* in the product which caused the injury, death or damage or the plaintiff can affirmatively demonstrate that the product seller was in possession of facts from which a reasonable person would conclude that the product seller had or should have had knowledge of the alleged defect in the product which caused the injury, death or damage; or
> (3) The product seller created the defect in the product which caused the injury, death or damage.
>
> N.J. Stat. Ann. § 2A:58C-9(d) (emphasis added).

The seller bears the burden of showing that it does not fit into any of the three exceptions to the seller safe harbor. *Bashir v. Home Depot*, 2011 WL 3625707, *4 (D.N.J. Aug. 16, 2011) (citations omitted). A party moving for summary judgment on an affirmative defense "would bear the burden of proof at trial and therefore must show that it has produced enough evidence to support the findings of fact necessary to win." *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 237 (3d Cir. 2007).

13

Only one aspect of Pep Boys's "seller" safe harbor defense is in dispute: should Pep Boys have known that the Boost-It was defective at the time of Plaintiff's purchase? (Plaintiff's Opposition Br., p. 11). The product manufacturer, Rally, is a defendant and the parties agree that Pep Boys neither created the Boost-It nor had any involvement in manufacturing, designing, packaging, or labeling the Boost-It. (Defendants' Statement of Undisputed Material Facts, ¶ 5).

Pep Boys argues that the record is absent of any facts which would allow a reasonable jury to find that Pep Boys knew or should have known of the packaging defect. Pep Boys notes that the one acknowledged Boost-It explosion that predated Plaintiff's purchase occurred at an AutoZone in Mexico.

Plaintiff argues that there is a factual dispute for the jury regarding whether Pep Boys should have known it was selling Plaintiff a defective product. Plaintiff reiterates the arguments discussed above in connection with the Defendants' actual knowledge of the defect. First, Boost-It labeling and instructions explain that the Boost-It's lead-acid battery would emit explosive gas, which should have alerted Pep Boys that the air-tight packaging was problematic. Second, Pep Boys must have known of the ventilation concerns surrounding lead-acid batteries because this knowledge is common amongst car mechanics and those familiar with lead-acid batteries. Third, a visual inspection of the Boost-It plastic packaging would reveal that pressure was building within and thus reveal the defect. (Plaintiff's Opposition Br., 11).

Plaintiff also points to an internal Pep Boys e-mail exchange about Boost-It's safety. On March 9, 2007, a Pep Boys store manager reported that a Boost-It exploded in his hand. (Plaintiff's Opposition Br., Ex. M-11). In response to this report, General Liability Manager Timothy Hurford stated "[w]e are having a lot [sic] of these type complaints we may want to pull these." (Plaintiff's Opposition Br., Ex. M-9). Mr. Hurford later clarified that the "complaints"

were a "customer claim." (Plaintiff's Opposition Br., Ex. M-9). Plaintiff reads Mr. Hurford's message as indicating that Pep Boys had received numerous complaints regarding the Boost-It by March 12, 2007, potentially including complaints that pre-dated Plaintiff's February 17, 2007 incident. (Plaintiff's Opposition Br., Ex. M-9).

Taken together, this evidence could support a finding Pep Boys should have known that the Boost-It had a packaging defect.

Accordingly, Pep Boys's motion for summary judgment on Count VI is denied.

## IV

This Court has reviewed all submissions. For the reasons set forth in the above Memorandum, IT IS on this 27th day of October 2011,

ORDERED that Defendants' Motion for Summary Judgment dated June 24, 2011 (Docket Entry 44) is granted in part and denied in part;

ORDERED that Plaintiff's claim for punitive damages is dismissed; and

ORDERED that Counts One, Two, Four, Five, Seven, Nine and Ten[6] are dismissed with prejudice.

<i>s/Peter G. Sheridan</i><br>
PETER G. SHERIDAN, U.S.D.J.

---

[6] Please note that Counts Nine and Ten are misnumbered in the complaint as the second Count Eight and Count Nine respectively.